1829

HILTON HEAD AIR SERVICE, INC., Respondent, Cross-Appellant v.
BEAUFORT COUNTY, Appellant, Cross-Respondent.
(418 S.E. (2d) 849)

Court of Appeals

*Terry A. Finger,* of *Novit & Scarminach,* Hilton Head Island, *for appellant, cross-respondent.*

*Herbert W. Hamilton,* of *Whaley, McCutchen, Blanton & Rhodes,* Columbia, *for respondent.*

Heard Oct. 14, 1991.

Decided May 26, 1992.

Reh. Den. July 16, 1992.

BELL, Judge:

This is an action for specific performance and for declaratory and injunctive relief arising out of a lease. Hilton Head Air Service, Inc., commenced suit against Beaufort County, alleging the County's plans to relocate and develop a commercial air service terminal violate the Hilton Head Airport Master Plan and the terms of a May 11, 1979, lease between the parties. The County answered and counterclaimed, alleging that Air Service breached the terms of the lease. The County

sought a decree terminating the lease and damages for unpaid rent. Air Service replied to the counterclaim, alleging, among other things, the affirmative defense of waiver. The circuit court referred the matter to the master in equity for final judgment with direct appeal. The master denied the prayer for an injunction, ordered the County to lease 2.4 acres of property at Hilton Head Airport to Air Service, and dismissed the counterclaims on the ground that the County had waived its right to strict performance of the lease. Both parties appeal. We affirm the denial of injunctive relief and the dismissal of the counterclaims. We reverse the order requiring the County to lease the additional 2.4 acres on the terms imposed by circuit court.

In 1974, the County leased property located at the Hilton Head Airport to Air Service. Since 1977, Air Service has operated an aviation business on the leased premises, providing services to the flying public such as fueling, maintenance, and repair of aircraft. Air Service has also allowed rental car companies to operate on the premises.

On May 11, 1979, the County and Air Service entered a twenty-five year lease which is the subject of this lawsuit. It provided:

> The Beaufort County Council will act to develop the Hilton Head Airport as shown in the Hilton Head Airport Master Plan Study as accepted by the Federal Aviation Administration, with the exception that Beaufort County does not intend to extend the airport runway beyond its present 3,700 foot length.

An airport master plan study is a development plan designed to assist the orderly growth and development of an airport. Normally, an airport study makes a twenty-year projection for development. Typically, an airport master plan is updated every five years in accordance with the recommendations of the Federal Aviation Administration.

The Hilton Head Airport master Plan Study was first commissioned in 1973. One purpose of the study was to evaluate several new sites for the airport, analyze the existing airport site, and determine whether the airport should move or remain at the existing site. The study's final recommendation was to remain at the existing site.

The 1977 version of the Master Plan Study in use when the County entered the 1979 lease with Air Service included a "Terminal Area Plan" that showed a future "proposed" terminal on the same side of the airport runways as the premises leased to Air Service. However, it also contained the following disclaimers:

> . . . [T]his study produced as a planning tool for Beaufort County. The 20 year recommendations and projections were based on aviation facts and requirements, and approval of this plan does not in any way obligate Beaufort County to carry out its recommendations. * * * *
> The contents do not necessarily reflect the official views or policy of the FAA. Acceptance of this report by the FAA does not in any way constitute a commitment on the part of the United States to participate in any development depicted therein nor does it indicate that the proposed development is environmentally acceptable. . . .

An updated version of the Master Plan Study in use when this suit commenced locates the "proposed" terminal on the opposite side of the runways from Air Service's operation. This Master Study Plan has been accepted by the Federal Aviation Administration.

I.

Air service contends the 1979 lease bound the County to develop the airport as shown in the 1977 Master Plan Study. It claims the later revision of the study moving the proposed terminal to the other side of the runways constitutes a breach of the lease. Consequently, it argues, the master erred when he denied a mandatory injunction compelling the County to develop the terminal at the location shown in the 1977 Master Plan Study.

We hold the master properly denied the injunction. According to its own provisions, the Master Plan Study is a twenty-year planning tool subject to continuing modification and approval by the Federal Aviation Administration. The 1979 lease does not say, as Air Service suggests, the County must develop the airport according to the Master Plan Study "as it now exists with no changes." On the contrary, the words say the County is responsible to develop the airport "as

shown in the *Hilton Head Airport Master Plan Study* as accepted by the Federal Aviation Administration." The 1977 Study is not specified.

These words must be read in context. At the time the parties entered the lease, the airport master development plan was contemplated as an ongoing plan covering an extended period during which, as the Study itself emphasized, conditions would change. Furthermore, the disclaimers quoted above made it clear the Study was not a binding "fixed for all time" document. When they entered the lease, the parties well knew conditions would change and the Master Plan Study would be, as in fact it has been, updated from time to time.

The County's duty under the lease was, likewise, a continuing responsibility over a twenty-five-year term. Nothing in the lease indicates the County was restricted to conditions as they existed in 1979 in carrying out its long term responsibilities as lessor. In this respect, the responsibility to act in accordance with the Study was similar to other responsibilities listed in the same section of the lease. Those responsibilities included maintaining the runways in a safe condition, mowing grassy areas, protecting approaches to the airport, and complying with Federal Aviation Administration regulations and guidelines. It would be farfetched to claim these provisions meant the County would only mow those grassy areas existing in 1979 or only comply with 1979 federal regulations and guidelines.

The Master Plan Study under which the County intends to build a new terminal shows the terminal on the opposite side of the runways from Air Service's leased premises. The Federal Aviation Administration has accepted the plan. Thus, the County is in compliance with its responsibility under the lease to develop the airport "as shown in the Hilton Head Airport Master Plan Study as accepted by the Federal Aviation Administration." The County has not breached the lease and should not be enjoined from proceeding with development of the terminal.

## II.

Air Service also seeks a decree of specific performance requiring the County to lease it a 2.4 acre parcel adjacent to the northeastern boundary of its existing lease-

hold on the same terms as the 1979 lease. Initially, Air Service wished to lease and improve the additional land for use as an aircraft parking ramp. In September, 1988, Air Service requested the Beaufort County Aviation Board to authorized a lease of the additional 2.4 acres for aircraft parking. The Board approved the request at its December meeting. Several months later, Air Service changed its plans to include parking rental cars on the additional land. The Federal Aviation Administration will not permit rental car parking in this area for safety reasons.

The 1979 lease provides that it may be modified to expand the leased area "upon such terms, conditions, and requirements for improvements on the additional space as the county may reasonably require."

Pursuant to the Board's authorization, an attorney for the County drew a "Lease Amendment and Modification" adding the 2.4 acres to the leasehold. The Amendment contained the following two clauses:

> 4. All improvements to the Additional Property shall be at Lessee's sole cost and expense. All improvements must receive approval from the Lessor and the Federal Aviation Administration prior to construction. * * * *
>
> 5. Notwithstanding any provision contained herein or in the Lease, the Lessee shall use the Additional Property for the specific purpose of aircraft parking, tie-down, servicing, and for no other purposes. * * * *

When the County presented the Amendment to Air Service for execution, the president of Air Service refused to sign it and struck through clauses 4 and 5. The parties have never agreed on the terms for leasing the additional 2.4 acres and they have signed no document including the tract in the leasehold.

The 1979 lease clearly states that the County may require any lease of additional property to be subject to reasonable terms, conditions, and requirements. There is no evidence the County acted unreasonably or in bad faith when it made the additional 2.4 acres subject to clauses 4 and 5. Air Service simply disagrees with those terms and refuses to enter a lease which includes them. In the absence of agreement between the parties there is no lease of the additional property. *See,*

*Player v. Chandler*, 299 S.C. 101, 382 S.E. (2d) 891 (1989).[1] The court cannot make a lease for the parties. *Amick v. Hagler*, 286 S.C. 481, 334 S.E. (2d) 525 (Ct. App. 1985). Thus, the master erred in ordering the County to sign a lease of the additional acreage to Air Service.[2]

## III.

The County also appeals from the dismissal of its counterclaims. The counterclaims relate to the operation of rental car services on the leased premises. Under the 1979 lease, automobile rental service is a commercial activity permitted on the premises.

## A.

The County first claims Air Service has breached the lease by allowing car rental agencies to operate on the premises under subleases to which the County has not consented in writing. The 1979 lease requires the lessor's written consent to subleases. The County claims this alleged breach entitles it to terminate the lease.

The short answer to these contentions is that the arrangement between Air Service and the rental car companies is not a sublease; it is a license. The 1979 lease requires written consent only for an assignment or a sublease of the leasehold. Since Air Service has neither assigned its lease nor sublet any part of the premises to the rental car companies, it has not breached the written consent requirement.

The assignment of a lease or the subletting of leased premises conveys an interest in the land. An assignment is a conveyance of the lessee's entire interest in the demised premises without retaining any reversionary in-

---

[1] While the parties were negotiating the terms of the additional lease, the County allowed Air Service to enter the property and construct substantial improvements. The County now claims Air Service was a trespasser on the land who should be evicted and forfeit the improvements. The master did not pass on these issues. We note, however, that Air Service entered the land and made the improvements with the County's permission, knowledge, and acquiescence. Should the parties be unable to negotiate the terms of the lease in light of this opinion, Air Service may well have a claim for the value of any betterments to the property. However, we neither reach nor decide this issue.

[2] The motion passed by the County Aviation Board merely authorized a lease of the 2.4 acres. It is not, as the master seems to have thought, a lease itself.

terest in the leasehold. *See, Neal v. Craig Brown, Inc.,* 86 N.C. App. 157, 356 S.E. (2d) 912 (1987). A sublease is a conveyance by the lessee of a part of the leasehold term with the lessee retaining a reversionary interest in the remaining unexpired term. *Id.* In contrast, a license to be on the premises for an agreed upon purpose is a contractual right personal to the licensee. *See, Bunn v. Offutt,* 216 Va. 681, 222, S.E. (2d) 522 (1976). A license does not vest in the licensee any estate or interest in the land. *See, Hill v. Smith,* 51 N.C. App. 670, 277 S.E. (2d) 542, *review denied,* 303 N.C. 543, 281 S.E. (2d) 392 (1981). It conveys only the temporary privilege of being on the land for some agreed purpose. *See, Henson v. Airways Service, Inc.,* 220 Ga. 44, 136 S.E. (2d) 747 (1964).

The arrangement between Air Service and the rental car companies was concluded by a simple letter with some of them and an oral agreement with the others. Each agreement provided that Air Service would supply the car company with counter space in the terminal and ten reserved parking spaces in the parking lot. In return, the car company would pay Air Service 10% of its gross revenue from its business each month. The agreement was for no definite term, but was terminable at will by either party. It gave no rights of exclusive possession and demised no interest in realty. In other words, it had none of the essential characteristics of a sublease. Licensing the rental car companies to operate on the premises violates no provision of the 1979 lease.[3]

## B.

The County also argues Air Service breached Paragraph 11 on page three of the 1979 lease by allowing the rental car companies to operate on the premises without first obtaining written permission to provide commercial services from the Beaufort County Council. Paragraph 11 sets out a responsibility of the lessor, not the lessee. It relates to commercial activities on those portions of the Hilton Head

---

[3] We note that Air Service has had rental car services on the premises since 1977 with the County's full knowledge. The County has also received a portion of the income from the rental car business as additional rent under the 1979 lease. Only when the dispute arose over location of the new terminal and the terms of the additional lease of the 2.4 acres did the County assert the rental car business breached the lease and justified its termination.

Airport not leased to Air Service. It imposes no duty on Air Service. Thus, Air Service has not breached this paragraph.

## C.

Finally, the County argues Air Service breached the 1979 lease by using the wrong method to calculate its gross revenues for the purpose of paying additional rent. It alleges this breach entitles it to terminate the lease and collect $100,944.05 in additional rent on which Air Service has defaulted.

The 1979 lease obligates Air Service to pay a stated ground rent plus an additional rent based on revenues from its operations. It provides:

> 1. The lessee will also pay the County 1% of his [sic] gross revenue as an additional fee for the lease. Gross revenues are defined as all revenues received for all services rendered and all objects and materials sold with the exception of aircraft sales.
>
> 2. Gross revenues of any sub-lease will be reported and counted as gross revenues of the lessee in computing percent of gross fees due the County.

By a later agreement the parties modified the percentage from 1% to 1½%, which Air Service has paid.

Under its contracts with the rental car companies, Air Service receives 10% of their gross revenues as payment for permission to operate the rental car businesses on the premises. It is undisputed that Air Service has always included the full amount of its receipts from the rental car companies in its gross revenues for purposes of calculating the additional rent it owes the County. In the past, the County has always accepted this calculation without question.

The County now asserts that Air Service should have used the gross revenues the car companies receive from their business rather than the gross revenues Air Service receives from the car companies to compute the additional rent. But this is not what the 1979 lease says. The lease says the lessee will pay a percentage of its gross revenues (i.e., the revenues the lessee receives) to the County. It does not say the lessee will pay a percentage of the gross revenues of sublessees, licensees, concessionaires or others who contract with Air Ser-

vice for the privilege of doing business at its facility. The percentage due is based on Air Service's receipts, not the receipts of others. This is plain from the lease. Air Service has complied with its obligation. The County's claim that there has been a breach is meritless.

We affirm the judgment denying the injunction against constructing the new airport terminal and dismissing the County's counterclaims. We reverse the judgement ordering the County to sign a lease for the 2.4 acres.

Affirmed in part, reversed in part.