RICHLAND–LEXINGTON AIRPORT
DISTRICT, Plaintiff,

v.

AMERICAN AIRLINES,
INC., Defendant.

No. 3:99–1230–17.

United States District Court,
D. South Carolina,
Columbia Division.

Jan. 11, 2002.

Robert Bryan Barnes, Stacey M. Lynch, Rogers Townsend and Thomas, Columbia, SC, for Plaintiff.

Pamela J. Roberts, Nelson, Mullins, Riley and Scarborough, Robert Yates Knowlton, Haynsworth, Sinkler, Boyd, Columbia, SC, Alec Bramlett, DFW Airport, TX, for Defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER FOR JUDGMENT

JOSEPH F. ANDERSON, JR., District Judge.

### PROCEDURAL HISTORY AND BACKGROUND

This is an action by the plaintiff, Richland–Lexington Airport District ("Airport") against American Airlines, Inc. ("American") to collect outstanding rent allegedly due from American under an airport lease agreement. Airport also seeks a declaratory judgment regarding future rent amounts due. Distilled to its essence, American contends that no rents are due because a massive airport renovation project (which it contends was not consented to by the requisite number of airlines), destroyed or substantially altered its leased space and breached the covenant of quiet enjoyment contained in its lease with Airport.

Both parties consented to a non-jury trial, which this court tried from August 7—10, 2001. After receiving the testimony, carefully considering all the evidence, weighing the credibility of the witnesses, reviewing the exhibits and briefs, and studying the applicable law, this court makes the following Findings of Fact and Conclusions of Law pursuant to Fed. R.Civ.P. 52.[1] The court notes that to the

extent any of the following Findings of Fact constitute Conclusions of Law, they are adopted as such, and to the extent any Conclusions of Law constitute Findings of Fact, they are so adopted.

### FINDINGS OF FACT

Plaintiff Airport is a governmental entity, created under the laws of the state of South Carolina, which operates the Columbia Metropolitan Airport. Defendant American is a corporation organized in some state other than the state of South Carolina, and does business in South Carolina.

Commercial airports, such as the one at issue in this litigation, generally operate in complex and dynamic environments, and therefore must continuously plan for the future. One planning tool is a document referred to as an "Airport Master Plan" which is designed to assist airport executives in the management of orderly growth and development of an airport. Generally, an airport master plan includes an airport layout plan which depicts graphically some of the items described in the text of the master plan. Airport master plans are periodically revised. In 1984, the Columbia Airport adopted an Airport Master Plan which was revised in 1995.

After airline industry deregulation in 1978, airlines were generally offered one of two forms of lease agreements with airports. The simplest form, which is often deemed more expensive, is a lease agreement for a term of one year, generally referred to as an "annual contract." The second, more widely-used lease agreement, is a long-term residual cost contract, also

1. After all of the evidence was received, the court took the matter under advisement and requested that both parties submit proposed orders. In a status conference conducted in November 2001, the court announced its tentative decision and invited the parties to make additional submissions to the court. In as much as the court has ruled in favor of the plaintiff on the two principal issues in dispute in this litigation, this order borrows some of its paragraphs from plaintiff's submission. As filed, this order represents the court's own independent judgment in this case.

known as a Use and Lease Agreement ("ULA"). Airlines entering into ULAs are commonly referred to as "signatory carriers."

Annual contracts require an airline to pay higher landing fees than ULAs and do not give an airline any control over the airport. ULAs, on the other hand, are residual cost contracts where a signatory carrier pays any shortfall suffered by an airport after an airport has exhausted revenues available through all other sources. Likewise, a signatory carrier shares in any surplus realized by an airport. In other words, residual cost contracts or ULAs place an airport and a signatory carrier in a partnership-type arrangement, where a signatory carrier shares in the profits and losses of an airport's operations.

At the Columbia Metropolitan Airport, the first ULA was executed with carriers Delta Airlines and Eastern Airlines. These ULAs commenced in 1979 for a term of thirty years. In 1985, American signed an annual contract and began offering service to Columbia. In 1986, instead of re-entering an annual contract, American signed a ULA with an expiration date of December 31, 2009—the same termination date as on the existing ULAs for Delta and Eastern.

American served the Columbia Metropolitan Airport from 1985 through November 15, 1992. In late 1992, American notified the airport that it was terminating jet service to Columbia, effective November 15, 1992. In late 1992, American Eagle entered a sublease with American and began passenger service to Columbia, essentially stepping into the shoes of American under its ULA. Ultimately, American vacated its space in July 1996.

This litigation was precipitated by American's abandonment of its leased space under the ULA. As noted previously, American contends that the Airport's renovation project destroyed its leased space

so that the subject matter of the ULA no longer existed. In a related position, American contends that the renovation project constituted a breach of the covenant of quiet enjoyment, thereby voiding the ULA.

Airport counters by suggesting that, as noted above, American was in the process of abandoning service to the Columbia airport in any event (a process that took several years because, as noted previously, American first subleased its space to American Eagle which then vacated the premises in 1996). Airport contends that American's failure to pay rent due under the ULA was not justified for several reasons. First, Airport contends that there has been no breach of the covenant of quiet enjoyment because, throughout the entire renovation process, American was allowed to use its existing gate, and the gate was destroyed only after the new gate was constructed several hundred feet away. In other words, American was not required to move to temporary, makeshift quarters during the renovation.

As to the contention that the subject matter of the ULA was ultimately destroyed (once the new gate was constructed), Airport responds that the ULA was a lease of the entire airport facility and that the relocation of the gate and the change of its character did not vitiate the lease. Airport also takes the position that in any event, American is bound to pay rent because of several provisions in the ULA that allowed capital improvement projects to be implemented with the cost being passed on to unconsenting airlines. Specifically, Airport contends that the renovation project was approved by the Federal Aviation Administration ("FAA") when the FAA approved a Passenger Facility Charge that included a description of the renovation project. Airport contends that the FAA approved and authorized the cap-

ital improvement project a second time when it approved the revised Airport Master Plan. Airport contends that these two FAA approvals authorized it to make the changes at the Airport even in the face of opposition by carriers serving the Airport. Finally, Airport contends that, even absent FAA approval through the Passenger Facility Charge or Airport Master Plan process, the renovation project was approved by a majority-in-interest of the airlines serving the airport and thus proper under the Majority–In–Interest provision of the ULA.

The court agrees with the plaintiff that FAA approval was obtained in two separate particulars, and that a Majority–In–Interest of the airlines, as defined in the ULA, approved the changes. Thus, the court concludes there has been a breach of the lease. However, the court disagrees with the Airport's calculation of the rent due and will make an appropriate adjustment so that American is not charged rent on the baggage makeup area for which rent is not charged to competing airlines.

### Particular Provisions of the Airport's ULA

Article VI of the ULA (as amended in 1991), contemplated a process where the signatory carriers and the Airport would coordinate annual adjustments to rents (the "Rent Setting Process"). Typically, the Rent Setting Process involves the following schedule: (1) in October of each year, the Airport publishes its proposed budget for the next year; (2) in November, the signatory carriers submit comments to the budget proposal; (3) in December, the Airport proceeds with adoption of the budget; and (4) in March of the following year, an audit for the prior year is performed so that any adjustments for surpluses or shortfalls can be made.

Each year from 1987 to 1990, the parties memorialized the Rent Setting Process in Article VI by formal written amendments to the ULA. In 1991, the first unnumbered paragraph of Article VI was amended to delete any references to meetings of the carriers and the Airport to "determine the adjustments" to the rates. The new language of the amended Article VI provided that the meetings were to "discuss" (as opposed to "determine") estimated expenses and revenues as well as the proposed budget. The amended Article VI also provided that the airlines "will have the opportunity to comment on and be heard with respect to the matters to be discussed in the meeting."

Article VI.13 of the ULA contains a unique provision which states: "The projects called for in the Airport's Master Plan as approved by the Federal Aviation Administration, may be undertaken by Lessor...." This provision gives the FAA the authority to rule on disputes between the Airport and airlines concerning development projects. The FAA's approval process for Passenger Facility Charges, discussed below, also fulfills that function.

Another method by which changes to the Airport facility are proposed and implemented is the Majority–In–Interest ("MII") provision of ULA Article VI.15. Essentially, this provision allows a majority of the airlines serving the Airport to approve changes, which then must be accepted by airlines in the minority. The MII clause provides in pertinent part: "payments ... will not be charged to Airport cost ... that are not included in the then current Master Plan ... or are not required by FAA for safety ... unless ... approved by a Majority–In–Interest of the Airlines." Article VI.15 defines Majority–In–Interest as "at least one half in number of the airlines serving the Airport which have agreements in effect substantially similar to this one, which collectively enplaned at least fifty (50%) percent of the

passengers at the Airport during the preceding calendar year."

Articles VI.13–15 of the ULA set forth the parties' intent to collectively address the circumstances under which the Airport could undertake capital improvement projects and have those costs put into the cost category for which the signatory carriers have responsibility. Article VI.13 allows the Airport to undertake capital projects if such projects are provided for in the Master Plan. Article VI.14 allows the Airport to undertake projects required by the FAA. Article VI.15 allows projects which, if not available by Article VI.13 or 14, are allowed by a Majority–In–Interest.

ULA Articles VI.13–15 were not intended solely as funding provisions that would allow the Airport expenditures to be included in the rate base. Rather, it was the intent of these provisions to affirmatively grant the Airport the authority to make the capital improvements described in those paragraphs. Because Articles VI.13 and VI.15 of the ULA are the only provisions that expressly mention the Airport Master Plan and capital improvements, it would be unreasonable to interpret these references as applying only to the rates and charges provisions of the ULA.

American suggests that various article titles of the ULA imply that Articles VI.13–15 are merely methods for *calculating* funding only, and that they do not provide mechanisms whereby costly airport expenditures may be forced upon a non-consenting carrier. On the contrary, Article XXI of the ULA expressly states that article titles and headings are for convenience and reference only and "in no way define, limit, or describe the scope or intent of any provision of this Agreement."

Article VIII of the ULA contains a standard covenant of quiet enjoyment. It provides that the signatory carrier " . . . shall peaceably have and enjoy the premises, appurtenances, facilities, rights, licenses and privileges granted herein." There is, however, no provision in the ULA stating that the covenant of quiet enjoyment limits the provisions of Articles VI.13–15.

The standard ULA requires the Airport to give earlier signatory carriers the benefit of any better agreement that the Airport might give to a later signatory carrier (the "Equal Terms provision"). The Equal Terms provision indicates that the Airport and signatory carriers contemplated that new carriers would sign substantially similar ULAs. Long-term agreements substantially similar to American's ULA were also entered into by the Airport with Delta Airlines, United Airlines, Air South, and Piedmont Airlines (the predecessor to U.S. Airways).

The standard ULA also provides for different classifications of operations space: "preferential," "exclusive," or "common." A preferential gate is a gate where an airline has control of the gate when it is using the gate, but an airport can put another carrier on the gate when it is not being used by the carrier who has the exclusive control of the date. American has testified that "exclusive use [of a gate] means the airline has full and complete control of the gate at all times. A common gate is one that is fully controlled by the airport and can be used by any carrier that the airport may want to assign to that gate."

The standard ULA contemplates future cooperative changes in the airport operating environment (through expansion, renovation, or maintenance) as evidenced in the following ULA excerpts:

"Whereas, Lessor owns . . . the Airport, which is depicted on the attached exhibit A . . . *or as it may be changed in the future,* . . ."

Article II: " . . . Lessor shall operate . . . the Airport *in a first-class . . . manner.* Such operations, maintenance . . . shall

include the adequate and *proper operation and maintenance of ... all ... public facilities* and appurtenances within the boundaries of the Airport."

Article III: "Lessor does hereby grant Airline the non-exclusive use of the Airport, *in common with other users of the Airport.*"

Article III, final paragraph: "Nothing herein contained shall be construed ... as authorizing Airline, in its conduct of its business, *to interfere, unreasonably, with other persons, or tenants,* lawfully using, or leasing, Airport facilities."

Article VI:

1. Airport is operated primarily for the benefit of the users thereof....

5. Lessor agrees to use its best efforts to *maximize concession revenues and ancillary income* in order to help defray the expenses of the airport.

6. Consistent with good business practices Lessor agrees to use its best efforts to obtain the *maximum amount of income ... for the airport....*

13. The projects called for in the Airport's Master Plan ... *may be undertaken by Lessor* and amortization of costs and expenses related thereto, not covered by grants ... will be considered as airport expense....

14. Projects *required by the FAA for safety* will be undertaken by Lessor when it is prudent to do so and ... will be considered as airport expense....

15. Payments ... will not be charged to airport cost or expense, for projects that are not included in the then current Master plan ... unless such bonds and or borrowing are *approved by a majority in interest of the airlines....*

19. The gross revenues derived from the Airport shall be solely for the operation, maintenance, *improvement,* acquisition of equipment and supplies, management, expansion and financing requirements of Airport.

21. Lessor agrees to exercise prudence in the operation, maintenance, *improvement, expansion,* management and financing of the airport.

Article IX: "Lessor *may enter upon any premises* which are leased exclusively or preferentially to airline, or jointly to airlines and others, any reasonable time, ... in the exercise of its governmental functions as it relates to ... general welfare of the airport."

Article IV, paragraph five: "Airline is granted the preferential use of the Aircraft Loading Position designated on Exhibit B.... Lessor retains the right to permit other authorized airlines to use the Aircraft Loading Position ... and to use the Passenger Hold Room related thereto...."

(Emphasis added).

Article XXIX of the ULA (as added by its sixth amendment) provides that "[i]n the event of any action, suit or proceeding brought to collect the rentals and fees (or any portion thereof) due or to become due hereunder ... Airline shall pay Lessor's attorney fees in such sum as the Court may adjudge reasonable...."

### Announcement of Proposed Capital Improvements Project Preliminary Matters

In 1989, the Airport, through its Executive Director, Robert H. Waddle ("Waddle"), announced to the carriers that the Airport planned to undertake a Capital

Improvements Project ("CIP" or "the renovation project") which involved building an entirely new concourse and renovating the existing terminal. Signatory carriers did not favor the project from its inception.

Doug Hope, a representative of American's affiliate and sub-lessee American Eagle ("Eagle"), initially believed there were no means available to the carriers to prevent the CIP. Shortly thereafter (September 1992), American notified the Airport that it was terminating jet service in Columbia, effective November 15, 1992. Thereafter, the Airport Airline Affairs Committee ("AAAC") (a committee of all carriers serving the Airport) and the Airport began meeting regularly to determine if an agreement could be reached regarding the scope of the CIP. Negotiations ensued over the next few months.

In September 1992, Eagle entered into a sublease with American and began passenger service to Columbia, essentially stepping into the shoes of American under its ULA. Eagle vacated its airport space and terminated service in July 1996.

### CIP Approval by the FAA— The PFC Process

During 1992, the Airport decided to seek funding for part of the CIP improvements through the imposition of a charge known as a "Passenger Facility Charge" ("PFC"). To collect and utilize PFCs, an airport must first apply to the FAA. The application process requires: (1) description of the proposed project; (2) consultation with the airlines for input; and (3) notification on an international basis through publication in the Federal Register.

The Airport submitted its PFC application to the FAA in January 1993. The application described the CIP and included an Airport Layout Plan. The PFC application noted that the CIP involved demolition of the existing concourse and there-designation of gate areas and concourse

gates from preferential use to common use.

In as early as 1992, American became aware (through information contained in the PFC application) that the CIP involved demolition of its assigned gate area on the concourse and re-designation of its space from preferential use to common use.

Notice of the PFC application was published in the Federal Register on May 14, 1993, inviting interested persons to submit comments favoring or opposing the proposed PFC. American, as well as the other AAAC members, submitted their opposition to the improvements contemplated by the PFC application.

On August 23, 1993, the FAA approved the CIP as described in the PFC application, except for a proposed cargo apron. The FAA approval showed that the existing concourses would be demolished and replaced with a new concourse and connector. The FAA's Record of Decision provided an explanation of why it overruled the airlines' objections to the CIP. Thus, the FAA approved the renovation project when it approved the PFC application.

### CIP Approval by a Majority–In–Interest of the Airlines

During late 1993 and the first eight months of 1994, the Airport and the AAAC met frequently so the signatory carriers could negotiate a mutually acceptable CIP. As noted previously, the FAA had already approved the PFC application and underlying CIP in August 1993. The negotiations between the Airport and the signatory carriers failed. Ultimately, the AAAC bypassed Airport Director Waddle and commenced negotiations directly with the Airport Commission after a deadline for resolution had passed.

During these negotiations, American accepted the proposition that the CIP could be completed *with* MII approval. In a

meeting held September 30, 1993, Helen Tremont of U.S. Air remarked: "The airlines take issue with the statement that no MII is required because the improvements are shown on the approved ALP [Airport Layout Plan]." None of the airlines suggested that even if MII approval was obtained, the CIP could still be blocked by dissenting airlines because it could affect an airline's leasehold estate. Additionally, in a letter written by Helen Tremont (on behalf of the AAAC) dated April 5, 1994, the AAAC interpreted the ULA to mean that the CIP could be completed *only* with MII approval.

On August 8, 1994, there were four passenger airlines serving the Airport that executed substantially similar ULAs: Delta, U.S. Air, United Airlines, and American. On August 15, 1994, Air South signed a substantially similar ULA, although it did not actually begin providing passenger service until August 22, 1994, at the earliest.[2]

On August 8, 1994, Delta and U.S. Air wrote directly to the Airport Commission setting forth their agreement with the CIP as it was described in the PFC application, with certain modifications.[3] As noted earlier, the PFC application contemplated redesignation of concourse space from preferential to common use. Together, Delta and U.S. Air carried more than 50% of passengers at Airport during the 1993 calendar year. Therefore, their agreement and approval of the CIP and the inclusion of its cost in the rate base constituted a MII decision (as defined in the ULA).

Moreover, United Airlines ("United") approved the CIP at the same time as Delta and U.S. Air. Previously, United had been an active participant in the negotiations over the CIP's scope as evidenced in Exhibit 77 (which is essentially a duplication of U.S. Air's earlier letter). When the agreement between Delta, U.S. Air, and the Airport Commission was reached on August 8, 1994, United was also in agreement and "approved" the CIP. United further demonstrated its approval by continuing to pay rent under its ULA, even during the time it was not serving the Airport.

American argues that United did not vote *per se* in favor of the CIP. Airport claims that because there were only four potential voters[4] and since Delta and U.S. Air unequivocally supported the CIP, that United's approval "vote" did not impact the CIP approval. However, the uncontradicted testimony at trial showed that United supported the CIP. Therefore, this court finds that United supported the CIP at the time the CIP approval was reached on August 8, 1994. In other words, three of the four eligible carriers (if United is counted) or two of the four eligible carriers (if United is not counted) approved the CIP. Under either scenario, MII approval was achieved.

In addition to agreeing in its ULA to follow the agreement reached by the other carriers, Air South supported the CIP. Air South's ULA even listed the expected amounts of bond costs that would go into the rate base as a result of the CIP.

2. Although Air South was a signatory carrier to the ULA, it did not begin passenger service until August 22, 1994, beyond the August 8, 1994 date on which an MII of the other four carriers agreed to the CIP. Moreover, Air South's ULA expressly provided that it would consent to follow the CIP agreement reached by the other signatory airlines.

3. Such modifications are irrelevant to this issue and will not be discussed herein.

4. As noted previously, the four signatory carriers considered "eligible to vote" at the time of the CIP approval negotiations were Delta, U.S. Air, United, and American.

American argues that the MII provision is inapplicable to its ULA because there was no formal ballot. However, the ULA contains no provision requiring a formal ballot and the court will not imply one. Furthermore, the Delta/US Air agreement letter (which recited the percentages of enplaned passengers by Delta and U.S. Air), constituted a written vote in favor of the CIP. Additionally, for two years the parties negotiated approval of the CIP, which this court finds as evidence that Delta and U.S. Air supported the project.

As to MII approval, American again argues that the MII provision is simply a "funding provision." However, for the same reasons that argument was rejected with respect to the Master Plan issue (see page 5 *infra* ), it is rejected here as well.

When the ULA was signed, the parties intended to require that certain capital projects undergo MII approval, namely those not exempt by prior incorporation in the current Master Plan or as required by the FAA for safety reasons. In order to avoid confusion concerning whether Article VI.15 was limited as American claims, the parties included Article XXI which states that headings do not limit the terms of the agreement. The purpose of the MII provision would be defeated if a single airline no longer serving the Airport could effectively veto a CIP by refusing to consent to that CIP, particularly when implementation of the CIP would not materially or adversely affect the dissenting airline.

Bonds were issued by the Airport to fund the CIP. The Airport's bond disclosure documents contain statements that the Airport did not obtain MII approval. The purpose of an official statement in a bond issue is disclosure of risks and other information relevant to a potential investor's decision to invest in the bonds. Bond disclosure documents err on the conservative side. The court resolves this evidentiary conflict by concluding that the Air-

port erred on the side of caution in stating that MII approval was not obtained because prior to the filing of the bond disclosure document, the Airport did not have a formal AAAC vote approving the CIP. Furthermore, that the Airport did not wish to infer its authority under ULA Article VI.13 was insufficient.

 The Airport is not estopped by its statements in the bond documents from showing that it obtained *de facto* MII approval. Neither judicial estoppel nor collateral estoppel applies because the statements were not made in any litigation. *Hayne Federal Credit Union v. Bailey*, 327 S.C. 242, 489 S.E.2d 472 (1997) (judicial estoppel); *State v. Bacote*, 331 S.C. 328, 503 S.E.2d 161 (1998) (collateral estoppel). In the present action, equitable estoppel and promissory estoppel do not apply because American did not detrimentally rely upon the statement in the bond documents. *Evins v. Richland County Historic Preservation Com'n*, 341 S.C. 15, 532 S.E.2d 876 (2000) (equitable estoppel). American only discovered the bond document disclosures shortly before the trial in this action.

### Second CIP Approval by the FAA— The Master Plan Study

In light of the AAAC's position that the ULA required the CIP to be a part of the Master Plan (and not simply an Airport Layout Plan), the Airport undertook a Master Plan Study that was submitted to the FAA. It described the CIP in narrative form by incorporating by reference the previously FAA-approved PFC project and graphically illustrating the CIP on the Airport Layout Plan. On January 13, 1995, the Airport Master Plan was approved by the FAA, before construction began. Although the FAA stated that the Master Plan was "accepted," the parties agreed during trial that "acceptance" and "ap-

proval" were synonymous. Thus, the FAA approved the CIP a second time.

During trial, American raised the question as to which Master Plan the parties intended to refer to in ULA Article VI.13. American argues that ULA Article VI.13 refers to the 1984 Master Plan. Conversely, Airport claims Article VI.13 refers to the Master Plan, as amended from time to time. The court finds that the parties intended the Master Plan referred to in Article VI.13 of the ULA to mean the Master Plan *as amended.*

References to an "airport master plan" in ULAs are commonly understood in the airline industry to mean the current master plan, as amended. One of United's witnesses, Charles Henschel, testified that a Master Plan is an iterative document—it goes through regular revisions, but an airport only has one Master Plan. That Master Plan is simply modified or updated as events warrant. The FAA recommends that airport master plans be reviewed and revised approximately every five years. Federal Aviation Advisory Circular 150/5070A. *Hilton Head Air Service, Inc. v. Beaufort County,* 308 S.C. 450, 418 S.E.2d 849 (1992). Both the Airport and the Airlines were cognizant of FAA policies for Master Plan review at the time they entered into the ULA. Furthermore, when an airport executes 30–year leases (as is the customary procedure of the Columbia airport), the leases will obviously far exceed the life of a single version of the Master Plan.

Similar to the language in ULA Article VI.14 regarding projects required by the FAA for safety reasons, Article VI.13's exception for projects shown on the Airport Master Plan was apparently deemed important enough to be assigned a separate paragraph. Articles VI.13 and VI.14 should be given equal treatment. American's interpretation of Article VI is that the Article is limited to authorizing the Airport to charge the signatory carriers for improvements. That interpretation would allow American to withhold its consent to FAA-required safety improvements to American's preferential space. Consequently, the entire cost of the improvements would shift to the other airlines.

American contends that the Airport Master Plan referred to in Article VI.13 of the ULA was the plan in effect at the time the ULA was signed as opposed to the Master Plan as amended from time to time. This court rejects this argument because the ULA is reasonable only if both Article VI.13 and VI.15 are referring to the same Airport Master Plan. The reference in Article VI.15 to the "then current Master Plan of the Airport, which has been approved by the Federal Aviation Administration" is a reference to the exception contained in Article VI.13, just as the reference to "required by the Federal Aviation Administration for safety" is a reference to Article VI.14.

The Equal Terms clause (ULA Article XXII) would be ineffective if Articles VI.13 and VI.15 referred to different Master Plans. In order for later signatory carriers to achieve comparable terms with earlier signatory carriers, the ULAs must refer to a single Airport Master Plan. Airports could not reasonably function if airlines were bound by differing Master Plans for the same airport.

The CIP was a project "called for in the Airport's Master Plan as approved by the Federal Aviation Administration" within the meaning of ULA Article VI.13. The CIP was a project "included in the then current Master Plan of the Airport, which has been approved by the Federal Aviation Administration" within the meaning of ULA Article VI.15.

### Events of 1995 and 1996

In 1995, American sought a release from its obligations under the ULA. Previ-

ous requests had been refused. On February 8, 1995, United discontinued jet service to Columbia and also requested to be released from its ULA. The Airport, believing the Equal Terms clause (Article XXII) prevented it from treating signatory carriers differently, refused to release either American or United from their obligations under their respective ULAs with the Airport.

American and United brought their release requests before the AAAC. The AAAC then asked the Airport's consultant to prepare an analysis of the financial impact upon the AAAC members if the Airport accepted the surrenders from American and United. The analysis showed a potential for increased expenses to the remaining signatory carriers. Accordingly, the other members of the AAAC strongly opposed consent to the release of American and United from their respective ULAs.

On January 25, 1996, Eagle (which had assumed American's obligations under a sublease arrangement), notified the Airport of its intent to discontinue service to the Airport, effective July 1, 1996. Eagle stated it was terminating jet service to the Airport because of the downsizing of American's Nashville hub. Eagle did not cite the pending CIP or the potential changes in its operating space as reasons for terminating service.

After April 1996, neither American nor American Eagle made further ULA payments.[5] On October 19, 1996, the new concourse was completed.

American contends that the subject matter of the ULA was destroyed by the CIP because the space that American had agreed to lease in the old concourse no longer existed and its former ticketing area in the terminal building was relocat-

ed. The court finds this contention to be without merit.

The ULA provides for the use of the entire airport, not just a particular gate or passenger waiting area. The gate and passenger waiting area are only one part of the ULA package, and are of no value without the use of the runways and the control tower. Likewise, the baggage and passenger check-in facilities are intimately related to the use of the gate and passenger waiting area.

Unlike a typical commercial lease or deed, American never had exclusive rights to use the facilities in the old concourse and terminal. Rather, it had only preferential rights, which meant that the Airport was free to assign the gates and hold areas to other airlines when they were not in use by American. American's right or ability to use the Airport was not destroyed or materially impaired by the CIP or by the re-designation of space from preferential to common.

The Airport Master Plan, as amended from time to time, is implicitly incorporated by reference into the ULA. As the Airport Master Plan changes over time, it automatically redefines the leased premises subject to the ULA. *See* Exhibit B to the ULA (showing that particular preferential space assigned to American was automatically superceded by the Terminal Area Plan portion of the Airport Layout Plan, which showed the CIP). Therefore, American's rented space was never destroyed; it was merely redefined as contemplated by the ULA.

During the construction of the new concourse, adequate measures were taken by the Airport to allow the airlines, including American, to conduct their business in a normal fashion. The Airport never unrea-

---

**5.** Under the sublease agreement between American and American Eagle, American Eagle was responsible for payment of the rents due under the ULA.

sonably interfered with American's ability to conduct business at the Airport. American, as well as its sub-lessee Eagle, both ceased service to the Airport before the construction process could have disturbed it. Even if American had not vacated the Airport, it would have been able to conduct its business, as did all of the other passenger airlines during the construction and renovation.

After construction, the Airport (working with the AAAC) assigned American substitute space in the newly renovated facilities. However, usage of the new gates was re-designated as common use instead of preferential use. The space assigned to American in the new concourse and in the renovated terminal building was of better quality than American's previous space in the old concourse. The court therefore finds that the Airport acted reasonably in assigning American the improved space.

A Majority–In–Interest of the signatory carriers approved the usage conversion from preferential space in the old concourse to common space in the new concourse. The intent of the MII provision would be thwarted if a single airline who no longer served the Airport could effectively veto a re-designation of leased space from preferential to common use by refusing to consent—especially when the re-designation could create a reduction in expense to the dissenting airline.

After careful deliberation, a Majority–In–Interest of the signatory carriers approved a formula for allocation of expenses for the common use areas and such approval was memorialized in the meeting minutes. Implicit in the approval of the formula for allocation of expenses was the signatory carriers' acceptance of the re-designation from preferential to common use.

Because the renovations called for in the CIP were authorized by the FAA on two occasions (through its approval of the PFC request and through its approval of the required Master Plan) and were also approved by a Majority–In–Interest of the servicing airlines, American remains liable for the rent under its ULA. Accordingly, American's failure to pay rent constitutes a breach of its ULA and American is therefore liable for damages.

### Airport's Claim for Damages

■ Having determined that American breached its ULA with the Airport, the court must now calculate the outstanding rent due to the Airport. The court has calculated the rent charges that accrued before the CIP (1996–1997 rent years) by multiplying the rental rate by the number of square feet actually rented by American, except in the common areas. In the common areas, the parties allocated 20% of the cost evenly among the signatory carriers and allocated the other 80% based upon the relative numbers of passengers carried by the signatory carriers.

The rent charges that accrued after the CIP (1998–2000 rent years), were calculated using the same methodology. Although American had acquired the use of more common space between 1998 and 2000, each square foot was billed at the same rate.

Although American stipulated to the Airport's rental invoice amounts, American challenges the propriety of the amount. American alleges that it was billed for more square feet than it was required to have under the ULA. American contends that it should not be required to pay rent for a baggage makeup area assigned to it. The court agrees. Although American was the only airline being charged for exclusive space for baggage makeup areas (and four times as much space for that purpose than American originally leased), there is no factual basis for treating it differently from the other carriers for that type of space. Based upon this court's

personal inspection[6] of the Airport and other evidence before the court, the court finds that the baggage makeup area (on the east side of the airport) assigned to American by its nature is not "exclusive use" space and is not different in character from that space for which no charge was made to Delta, U.S. Air, United, and Continental. The Airport attempts to justify the difference in treatment by arguing that the west side does not have the same type of space that it assigned to American. The diagrams of the areas and the court's inspection of the facilities demonstrate no basis for such a difference. Moreover, Continental Airlines is currently operating out of the east side and is not being charged for baggage makeup space virtually identical to that assigned to American. Trial Exhibit 157.

■ The Airport argues that rather than deducting the charges it proposed to make to American for the baggage makeup space, it should be allowed to make a recalculation of rent for the years 1998 through 2000 for all of the airlines by allowing it to back-charge all carriers equally for baggage makeup space, thereby altering the amount of rent due from American. The court finds and concludes that this approach would be inappropriate.

The Airport has the burden of proving its entitlement to and the amount of rent due. The annual calculations of rent were the subject of annual negotiations between the carriers and agreements between the carriers (except American) and the Airport. The court finds and concludes that the Airport has not carried its burden with regard to its proposed charges to American for the baggage makeup space because it has not treated American fairly for such space compared to other carriers. It would be inappropriate to allow the Airport to change its theory and to argue the proposed new calculation after the conclusion of discovery and the trial of this case.

American also contends that it was inappropriate for the Airport to charge American for increased square footage for a ticket counter, ticket office, and concourse operations space. The court finds and concludes that these moderate increases were not substantial and were essentially offset by decreases in square footage for other types of areas.

Therefore, the court finds that the amount of rent due and owing to Airport from American is as follows:

| Year | Amount Due |
|---|---|
| Overpayment as of April 30, 1996 | ($ 14,550.00) |
| May 1, 1996—December 31, 1996 | 10,556.00 |
| 1997 | 106,055.00 |
| 1998 | 145,476.00 |
| 1999 | 112,813.00 |
| Subtotal | $478,762.00 |
| Less Landing Fee Credit | (254,313.00) |
| Less Credits for Baggage Makeup Area | (92,945.00) |
| Total Rent Due (through Dec. 31, 2000) | $131,504.00 |
| Late Payment Charge | 42,761.76 |

■ The ULA provides a late fee of one and one-half (1½%) percent per month on

---

**6.** At the conclusion of the trial, the court visited the Columbia Metropolitan Airport for the specific purpose of viewing the baggage makeup area. The court's visual inspection revealed that American's baggage makeup area, for which rent was assessed, was in no material respect different from the baggage makeup area for Delta, U.S. Air, United, and Continental for which rent was not assessed.

unpaid rent. Although American argues that it would be inequitable to apply late payment fees to the amount the court has found due, the court is unpersuaded by American's argument and finds no basis for disregarding the contractually agreed upon late payment penalty. Application of the 1½% per month late payment charge as simple interest (not compounded), yields an additional amount due of $42,761.76.[7]

The Airport has consistently tried to mitigate its damages and has made consistent efforts to lease space formerly assigned to American. The Airport has also maintained American's space in a favorable condition for a new tenant. This would allow a new tenant/carrier to remodel the space without undergoing major renovation or demolition.

### CONCLUSIONS OF LAW

### Enforceability of the ULA

As an initial proposition, this court concludes that Article VI of the ULA is not merely an "agreement to agree" on applicable rents and charges, as American argues. Article VI (as amended in 1991) unambiguously sets a procedure by which the Airport establishes rates and fees to which American is bound. Article VI gives American an opportunity to discuss and comment upon any expenses figured into the rate base. Article VI also allows American to request that the Airport reconsider any proposed rates and fees for the following year. Nevertheless, American's agreement to the rates established by the procedure in Article VI is not nec-essary for those rates and fees to be binding upon American.

### The ULA is Ambiguous

An ambiguous contract is one capable of being understood in more ways than one, or obscure in meaning through indefiniteness of expression. *Ebert v. Ebert,* 320 S.C. 331, 465 S.E.2d 121 (1995). In the present action, the ULA is ambiguous because of the conflict between Article VIII (covenant of quiet enjoyment) and Articles VI.13 and VI.15 (Airport Master Plan and MII provision).

"The purpose of all rules of contract construction is to ascertain the intention of the parties to the contract." *Thomas–McCain, Inc. v. Siter* 268 S.C. 193, 232 S.E.2d 728 (1977). A court has the freedom to apply the rules of construction most reasonably calculated to ascertain the intention of the parties. "Where the agreement in question is a written contract, the parties' intention must be gathered from the contents of the entire agreement and not from any particular clause thereof." *Id.* In order to avoid rendering the MII provision of the ULA null, the covenant of quiet enjoyment must be subordinate to the MII provision.

When a contract is ambiguous, extrinsic evidence relating to conditions surrounding the parties is admissible to aid in determination of the parties' intent. *Garrett v. Pilot Life Ins. Co.,* 241 S.C. 299, 128 S.E.2d 171 (1962); *Traynham v. Yeargin Enterprises, Inc.,* 304 S.C. 188, 403 S.E.2d 329 (1991).

---

7. Calculation of the late payment charge was arrived at after the court announced its decision and requested a calculation of the amount from the plaintiff. Plaintiff responded with a table, prepared by a CPA, copies of which have been furnished to defense counsel and filed with the Clerk of Court as Court's Amended Exhibit No. 1. American has agreed that both the formula for calculating late charges and the totals on the charge are correct, although American continues to deny that late payment charges are appropriate in this case.

### The Airport's Actions were Permitted by the "Airport Master Plan Provision"

 Common sense and good faith are key principles of contract construction. *C.A.N. Enterprises, Inc. v. South Carolina Health and Human Services Finance Com'n,* 296 S.C. 373, 373 S.E.2d 584 (1988). In construing a contract, each and every part of it must be taken into account and, if possible, given effect. One part of the contract should not be interpreted so as to annul another provision of the same contract.

The language in ULA Article VI.13 regarding which version of the airport Master Plan will apply is nearly identical to that considered in *Hilton Head Air Service, Inc. v. Beaufort County,* 308 S.C. 450, 418 S.E.2d 849 (1992). In *Hilton Head Air Services,* the court held that the county did not breach its lease when it chose to follow the most recent master plan rather than the master plan in effect when the tenant signed the lease. In *Hilton Head Air Services,* the court, as well as the plan study, recognized that the master plan contemplated change, as did the parties. Similarly, the 1984 Columbia Airport Master Plan in effect when American's ULA was signed also contemplated change and as a result, so did the parties.

American contends that the Master Plan referred to in Article VI.13 of the ULA is considered the plan in effect "at the time the ULA was signed"—not the Master Plan "as amended from time to time." This argument is rejected because it improperly isolates the wording of a single paragraph and disregards the interaction among sections 13 and 15 of Article VI.

The ULA is reasonable only if both Articles VI.13 and VI.15 refer to the same airport Master Plan. Article VI.15 clearly states that MII approval is necessary only for "... projects *not* on the then current Master Plan...." (Emphasis added).

Article VI.13 allows the Airport to undertake a CIP which is on the Master plan. Thus, the provisions of Articles VI.13 and VI.15 logically refer to the same Master Plan.

American contends that the re-designation of its previously preferential space to common space was a material breach of the ULA because that space was materially different from its prior space. The re-designation of the airlines' gate space from preferential to common was implicitly approved by the FAA through its acceptance of the CIP and the Master Plan. Therefore, that re-designation comes within the scope of projects permitted by ULA Articles VI.13 and VI.15.

 The covenant of quiet enjoyment is subordinate to the provisions of Articles VI.13 and VI.15. Any inconsistency between a general clause and a specific clause must be resolved in favor of the specific. *Square Lex 48 Corp. v. Shelton Towers Assocs.,* 98 Misc.2d 1039, 415 N.Y.S.2d 325 (N.Y.Sup.Ct.1978). Articles VI.13 and VI.15 are specific, custom-drafted provisions, while the covenant of quiet enjoyment is essentially a general "boilerplate" provision. Conduct that is permitted by Articles VI.13 and VI.15 does not violate the covenant of quiet enjoyment, when, as here, it was done in a manner that did not unreasonably interfere with American's use of the Airport.

Because the CIP was a project called for in the Airport Master Plan (as accepted by the FAA), the Airport did not breach the ULA by undertaking the CIP without American's consent, by destroying or relocating American's former preferential space without American's consent, or by re-designating American's formerly preferential space as common space without American's consent. American is obligated to pay rent under the ULA until the ULA terminates in 2009 under the terms

and conditions of the ULA as interpreted by this Order.

### The Airport's Actions were Permitted Under the Majority–In–Interest Provision

 A Majority–In–Interest provision is used by airports and airlines to reconcile competing interests in an environment where projects are necessary and unanimity among the stakeholders is unlikely. This court has determined that three out of the four airlines eligible to vote on the CIP eventually indicated their agreement, thereby securing MII approval.

 The intention or meaning in a contract may be manifested or conveyed either expressly or impliedly. Implicit in the ULA is that the covenant of quiet enjoyment is subordinate to the MII provision. Otherwise, the MII provision would require a *unanimity* of interest among the affected parties. Certainly, the parties could not reasonably have meant to require a unanimous vote when they used the word majority and defined majority to mean 50%, not 51%. In the absence of an express provision in the contract, the law will imply an agreement to do those things that according to reason and justice should be done to carry out the purpose for which the contract was made. *Columbia East Associates v. Bi–Lo, Inc.,* 299 S.C. 515, 386 S.E.2d 259 (S.C.Ct.App.1989).

 When the terms of a contract are in conflict, contemporary interpretations of the contract by the parties are determinative. *Kitchens v. Lee,* 221 S.C. 59, 69 S.E.2d 67 (1952). As noted previously, in 1993 and 1994, American interpreted the ULA to mean that the Airport could undertake the CIP if it obtained MII approval. There was no suggestion by American that the covenant of quiet enjoyment would prevent the CIP from going for-

ward, even if the CIP had achieved MII approval.

Because the CIP received MII approval, the Airport did not breach the ULA by (1) building the CIP without American's consent; (2) destroying or relocating American's former preferential space without American's consent; or (3) re-designating American's formerly preferential space as common space without American's consent. Thus, American is obligated to pay rent under the ULA until the lease terminates in 2009 under the terms and conditions of the ULA as interpreted by this Order.

### The Covenant of Quiet Enjoyment, Destruction of the Old Concourse, and Renovation of the Terminal Building

 Applied to the facts of this case, the defenses of breach of the covenant of quiet enjoyment and constructive eviction are different labels for the same theory. The elements of a cause of action or defense based on constructive eviction are: (1) that by some intentional act or omission of the landlord, the tenant is deprived of possession or that by some intentional act or omission the landlord substantially interferes with the tenant's beneficial use or enjoyment of the leased premises; and (2) as a result of the act or omission by the landlord, the tenant abandons the premises. *Pleasantburg Warehouse Co. v. Global Distribution, Inc.,* 287 S.C. 422, 339 S.E.2d 135 (1985). This is consistent with the rule for deeds that no breach of a covenant of quiet enjoyment occurs until there has been disturbance of possession by actual or constructive eviction. *Martin v. Floyd,* 282 S.C. 47, 317 S.E.2d 133 (1984).

 Unlike a typical non-airline commercial lease or deed, American never had exclusive rights to use the facilities in the old concourse and terminal.[8] American

---

8. *See* Exhibit 8, Article III "Lessor does hereby grant to Airline the non-exclusive use of

the Airport ...." and Article IV "Airline is granted the preferential use of the Aircraft

only had preferential rights, and the Airport was free to assign the gates and hold areas to other airlines when they were not used by American. The Airport did not constructively evict American or breach the covenant of quiet enjoyment because American and its sub-lessee (American Eagle) voluntarily left the Airport for reasons unrelated to the CIP.

Moreover, even if American and its sub-lessee had not voluntarily left the Airport, the covenant of quiet enjoyment would not have been breached. The evidence at trial made it abundantly clear that American would have been able to use the old concourse, without interruption, throughout the renovation period. In other words, if American had remained at the Columbia Airport, it would not have been required to use temporary, prefabricated buildings located away from its existing gate.

### Statute of Limitations Regarding American's Credits

A three-year statute of limitations applies to actions "upon a contract, obligation, or liability, express or implied, excepting those provided for in Section 15–3–520." S.C.Code Ann. § 15–3–530(1). The ULA is a contract. Therefore, the three-year statute of limitations period under § 15–3–530(1) applies to American's counterclaim for credits due thereunder.

A breach of contract action generally accrues at the time the contract is breached or broken. Just as a new cause of action accrues each time a rent payment is due, a cause of action for credit due under a lease accrues each time a credit becomes due. A cause of action for each of American's credits accrued at the time it became due.

American's counterclaim for credits due is barred by the statute of limitations.

Loading Position designated on Exhibit B...."

The last credit, which was in the amount of $46,707.00, became due in March 1996, after the annual audit.[9] Even if American's counterclaim related back to the date the Airport filed this civil action (March 26, 1999), it still brought its claim more than three years after its cause of action accrued.

With commendable candor, the Airport has agreed that even though the affirmative claim for the credits by American is barred by the statute of limitations, the law allows American to recoup the full amount of the unpaid credits which total $254,313. In other words, even though the statute has run on the counterclaims, American can still reduce its total debt to Airport under the equitable theory of recoupment. This results in a reduction of Airport's recovery.

Airport took reasonable measures to locate a new tenant and thus, properly attempted to mitigate its damages.

All other defenses offered by American, whether as to liability or damages, have failed due to lack of factual support or inapplicability as a matter of law.

#### Conclusion

This court finds, concludes, and declares that:

1. The ULA has not been terminated. The ULA is enforceable by Airport against American for rents accrued through the date of trial (April 7, 2001). Although at the beginning of trial, the parties agreed that the only evidence presented was through December 31, 2000, and Airport preserved its right to rents which have accrued since January 1, 2001.

2. Airport has not breached the ULA.

---

9. All other portions of the credit accrued in March of 1993, 1994, or 1995 after the annual audit.

3. American is not excused from performance under the ULA for any of the following reasons:

a) the cessation of its air service to the Airport;

b) the destruction of the old concourse in which American had been preferentially assigned space;

c) the relocation of American's gates and hold rooms to the new concourse and the relocation of its ticketing, baggage, and other space in the terminal building;

d) the re-designation of American's formerly preferential gate and hold room to common space in the new concourse; or

e) the reallocation and re-designation of American's former space in the terminal building.

4. Airport is entitled to a judgment of $174,265.76 ($131,504.00 for rent due through December 31, 2000, and $42,761.76 for late payment charges thereon through December 31, 2001). Post judgment interest on the judgment will continue to accrue at the rate of one and one half (1½%) percent per month, as agreed upon in the ULA.[10]

5. Pursuant to the stipulation of the parties, entitlement to attorney's fees and the amount of attorney's fees will be addressed by the court at a later time.

6. American shall remain obligated under the ULA in accordance with its terms, as interpreted by this Order, until its expiration on December 31, 2009, unless the ULA is sooner terminated in accordance with its terms or is sooner terminated as a

10. American disagrees with this rate and argues that the rate is controlled by 28 U.S.C.

consequence of any future events which provide cause for termination.

IT IS SO ORDERED.